IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| JUENELL JACKSON, | |
| Plaintiff, | |
| v. | No. 19-cv-4924 |
| | Judge Franklin U. Valderrama |
| NORTHWESTERN MEMORIAL HOSPITAL, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Juenell Jackson (Jackson) worked for Northwestern Memorial Hospital (NMH) as a Patient Registration Representative. Jackson was terminated following an investigation into reported misconduct by Jackson, and three other Patient Registration Representatives, alleging misuse of patient information, including credit card information. Jackson sues NMH for race discrimination in violation of Title VII and 42 U.S.C. § 1981. Before the Court is NMH's motion for summary judgment. For the reasons below, the motion is granted.

## Background

### I. Summary Judgment Filings

As an initial matter, the Court addresses the numerous filings in briefing summary judgment in this case. Specifically, Jackson filed amended versions of several filings, and there were also issues of failure to follow the Court's Standing Orders and Northern District of Illinois' Local Rule 26.2(c) in filing documents under seal, resulting in multiple filings of the same document. So the record is clear, the

Court is considering the following filings in reaching its decision:[1] (1) NMH's Motion for Summary Judgment (Mot. Summ. J.) (R. 61)[2]; (2) NMH's Memorandum in support of its Motion for Summary Judgment (Memo. Summ. J.) (R. 63; R. 65); (3) NMH's Statement of Material Facts (DSOF), and Exhibits (R. 64; R. 66); (4) Jackson's Amended Response Brief to NMH's Motion for Summary Judgment (Resp.) (R. 88; R. 89); (5) Jackson's Additional Statement of Material Facts (PSOAF), and Exhibits (R. 90; R. 101)[3]; (6) Jackson's Response to NMH's Statement of Material Facts, and Exhibits (Jackson's Resp. DSOF) (R. 103; R. 104); (7) NMH's Reply in support of its Motion for Summary Judgment (Reply) (R. 98); and (8) NMH's Response to Jackson's Local Rule 56.1(d) Amended Statement of Additional Material Facts (NMH Resp. PSOAF) (R. 99).

## II. Local Rule 56.1 Statements and Responses

Before considering the merits of the motion, the Court must also address objections to, and evidentiary issues with, certain statements of fact, and the party's respective failures to comply with the Northern District of Illinois' Local Rules relating to the statement of material facts. Specifically, the Court considers Jackson's

---

[1]Many of the summary judgment filings are under seal, and a provisionally filed public version of the document was also filed, as required by the Court's Standing Order and Local Rules. For the Court's purposes, it relied upon the sealed, unredacted version of filed documents.

[2]Citations to the docket are indicated by "R." followed by the docket number or filing name, and where necessary, a page or paragraph citation.

[3]Jackson's Amended Statement of Additional Facts was filed with leave of Court after briefing had concluded, and that amended filing addressed information that required redaction. NMH filed a notice indicating that its Response to Plaintiff's Amended Statement of Additional Material Fact (R. 99) is intended to respond to Plaintiff's Amended Local Rule 56.1(d) Statement of Additional Material Facts As To Which Is Are [Sic] Genuine Issues of Fact (R. 101). R. 106, NMH Notice.

2

response to NMH's Local Rule 56.1 statements of material facts (*see* Jackson's Resp. DSOF), and NMH's objections to Jackson's response to NMH's Local Rule 56.1 statements of material facts (*see* Reply at 1–3), and NMH's objections to Jackson's Local Rule 56.1(d) amended statement of additional material fact (*see* NMH's Resp. PSOAF).

Local Rule 56.1 "aims to make summary-judgment decisionmaking manageable for courts." *Kreg Therapeutics, Inc. v. VitalGlo, Inc.*, 919 F.3d 405, 415 (7th Cir. 2019). When a party moves for summary judgment, it must submit three things: (1) a memorandum of law, (2) a short statement of undisputed material facts (LR 56.1 Statement), and (3) copies of materials that demonstrate the existence of those facts. *ABC Acquisition Co., LLC v. AIP Prod. Corp.*, 2020 WL 4607247, at *7 (N.D. Ill. Aug. 11, 2020) (citing N.D. Ill. Local R. 56.1(a)). The Rule 56.1 Statement must cite to specific pages or paragraphs of materials in the record. *Id.* (citing *Ammons v. Aramark Unif. Servs., Inc.,* 368 F.3d 809, 818 (7th Cir. 2004)).

The opposing party must file a response to the Local Rule 56.1 Statement, either admitting or disputing each fact. N.D. Ill. Local R. 56.1(e)(2). If the party chooses to dispute the fact, it must "cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the fact." N.D. Ill. Local R. 56.1(e)(3). If a party fails to cite specific evidence in its dispute, the fact "may be deemed admitted." *Id.*; *see also Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) ("When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those

facts are deemed admitted for purposes of the motion."). Cross references to other responses rather than to record evidence also violate Local Rule 56.1. *Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1019–1020 (N.D. Ill. 2018) (finding that Local Rule 56.1 "requires citations to the record evidence rather than cross reference to a reference to a citation."). The Seventh Circuit has "consistently upheld district judges' discretion to require strict compliance with Local Rule 56.1." *Kreg Therapeutics, Inc.*, 919 F.3d at 414. Local Rule 56.1 "aims to make summary-judgment decisionmaking manageable for courts." *Id.* at 415.

Beginning with Jackson's responses to NMH's statements of fact, as NMH points out in its reply, many of Jackson's denials do not comply with Local Rule 56.1. Reply at 2. Many of Jackson's denials fail to cite any evidentiary material that controverts the asserted fact. *See* Jackson's Resp. DSOF ¶¶ 2, 7, 12, 13, 22, 25, 28, 30, 32, 33, 38, 40–42, 44–45, 49, 56–59, 62, 64–65, 70, 72–73, 75, 82. Any fact not properly controverted is admitted. N.D. Ill. Local R. 56.1(e)(3); *see Cracco*, 559 F.3d at 632. Additionally, where Jackson responded to an asserted statement of material fact with additional facts that do not controvert the asserted fact will not be considered, either. *See* Jackson's Resp. DSOF ¶¶ 9, 14, 16, 19, 23–24, 26–27, 29, 31, 34–37, 43, 47, 52–55, 61, 63, 66, 67, 69, 74, 76, 78–80. *See Smith v. Cipolla*, 2023 WL 2646718, at *1 (N.D. Ill. Mar. 27, 2023). On that basis, the Court will not consider any denials which fail to cite to evidentiary material that controverts the asserted fact. Moreover, to the extent Jackson included new facts, or non-responsive information, in response to a statement of material fact, the Court will not consider

that information, which is tantamount of "set[ting] forth … facts, meaning facts that are not fairly responsive to the asserted fact to which the response is made." N.D. Ill. Local R. 56.1(e)(2).

Moreover, certain denials improperly cross-reference other responses instead of citing specific factual evidence to dispute the fact. *See* Jackson's Resp. DSOF ¶¶ 28, 32, 33, 40, 41, 45, 49, 56–58, 62, 64, 71–73, 75; *see Rivera*, 319 F. Supp. 3d at 1019–1020. This is improper under Local Rule 56.1, and the Court will not consider the cross-references as a substitute for providing record citations where an asserted fact is disputed.

In summary, where Jackson did not respond to NMH's statement of material fact by offering admissible evidence to controvert the asserted fact, or simply cross-referenced other responses, the Court accepts as true the facts set forth in NMH's Local Rule 56.1 Statement "to the extent th[ose] facts [a]re supported by admissible and docketed evidence." *Kreg*, 919 F.3d at 411 (cleaned up).[4]

Turning next to the merits of Jackson's proper objections to the DSOF, Jackson repeatedly objects to NMH's facts as hearsay. Jackson Resp. DSOF ¶¶ 23–29, 31, 36–37, 39, 40, 45, 49–54, 57–58, 60, 62, 64, 71–75. Hearsay is an out-of-court statement used to prove the truth of the matter asserted. Fed. R. Evid. 801(c). A court cannot consider inadmissible hearsay evidence for the purposes of summary judgment. *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016). However,"[s]tatements

---

[4]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, Cleaning Up Quotations, 18 Journal of Appellate Practice and Process 143 (2017).

introduced to show their effect on the listener are not offered to prove the truth of the matter asserted and therefore are not hearsay." *Torry v. City of Chicago*, 932 F.3d 579, 585 (7th Cir. 2019). The Court disagrees with Jackson that certain of the statements are hearsay, as the Court finds this information largely goes to the steps taken by NMH in reaction to receiving communications and reports from confidential informants about Jackson and the other employees it was investigating. *See* Jackson's Resp. DSOF ¶¶ 25, 28–29, 37, 39, 40, 45, 52–54, 57–58, 62, 64, 71–75. As the Seventh Circuit has explained, "[a] statement is offered to show an effect on the listener only if the listener heard and reacted to the statement." *United States v. Graham*, 47 F.4th 561, 567 (7th Cir. 2022) (cleaned up).

Here, for example, NMH includes statements detailing the steps taken after receiving phone calls from individuals reporting incriminating conduct by Jackson and other employees (DSOF ¶¶ 25, 28), decisions by NMH to involve certain people in the investigation (*id.* ¶ 29), NMH's outreach to the Chicago Police Department (CPD) about the investigation (*id.* ¶¶37, 40), the decision to terminate made by Lydia Splan (Splan) and Sara Williamson (Williamson) based upon the investigation (*id.* ¶ 39), why manager Tina Reagan (Reagan) felt confident the messages received by the investigator, John Brooks (Brooks), were messages sent by Jackson (*id.* ¶¶ 52–54), NMH's decision not to interview the subjects of the investigation based upon guidance from CPD (*id.* ¶ 57), and the steps taken by NMH after termination of the investigated employees to notify potential victims of the breach, and other authorities (*id.* ¶¶ 71–75). These assertions are not being offered by NMH to prove Jackson

engaged in the misconduct. As explained by NMH, it "is not citing to the phone calls, emails and text messages to prove that Jackson and the other three PRRs *actually* engaged in misconduct relating to patient information and valuables . . . Instead, NM[H] is using this evidence to show *the effect on the state of mind of the decision-makers*, Splan and Williamson, i.e. what motivated them when they decided to terminate Jackson and the other PRRs." Reply at 9 (emphasis in original). The Court agrees, and finds these statements are not hearsay on this basis. *See Khungar v. Access Community Health Network*, 985 F.3d 565, 575 (7th Cir. 2021) (cleaned up) (complaints about employee were not hearsay because they were not "offered to show that [employee] in fact engaged in the conduct complained of, but to show [decisionmaker's] 'state of mind when he made his recommendation.'").

The Court, however, agrees with several of Jackson's remaining hearsay objections to the extent NMH is relying upon the information to establish Jackson engaged in the misconduct she was accused of. Jackson's Resp. DSOF ¶¶ 23, 24, 26–27, 31, 36, 49–51, 60. Most of the factual assertions rely upon statements made by, or communications from, the confidential informants reporting the misconduct to NMH, and/or screenshots of conversations between the confidential informants and Jackson. *See id.* However, the Court will consider the evidence in the cited-to statements of material fact only to the extent the evidence is not being offered for the truth of the matter asserted, e.g. to prove that Jackson engaged in the misconduct she was accused of engaging in, but will consider the evidence as to the effect on NMH in proceeding with the investigation, and making the decision to terminate.

Jackson also objects to certain statements of fact as being based upon "unauthenticated" information. To the extent Jackson objects on the basis of hearsay, the Court addressed those arguments above. The Court construes Jackson's objection based on authenticity to be one of admissibility, which is permitted under Local Rule 56.1(e)(2). However, in reviewing these objections, the Court finds that Jackson is actually arguing that the information is hearsay and inadmissible, and not that the record itself is inauthentic. Further, in its submission, NMH provided Declarations from several NMH employees, including manager, Reagan, the investigator, Brooks, and the decisionmakers, Williamson and Splan, verifying the records. R. 64, Exh. B–E. Again, to the extent NMH relies upon the investigation records to establish the actions NMH took in investigating and ultimately terminating Jackson, the records are admissible for their effect on the decisionmaker, and not to establish that Jackson engaged in the conduct she was accused of.

In her responses to NMH's statement of material facts, in virtually every response, Jackson objects and asks the Court to deny NMH's Motion on the basis that NMH "combin[ed] multiple statements of fact" in violation of the Local Rules. *See generally* Jackson Resp. DSOF. The Court disagrees with Jackson's objection. The Local Rules provide that each statement of material fact "must consist of concise numbered paragraphs." N.D. Ill. Local R. 56.1(d)(1). The Local Rule does not require each statement of material fact be limited to one statement of fact or a single sentence, as suggested by Jackson. *See Banks v. Illinois Central Railroad Company*,

2019 WL 3080923, at *3 (N.D. Ill. July 15, 2019) ("Nothing in Rule 56.1 instructs parties to include only one fact per paragraph.")

Lastly, the Court addresses NMH's objections to Jackson's statement of additional facts. NMH Resp. PSOAF. Specifically, NMH contends the PSOAF are not supported by admissible evidence, for example statements are not based on personal knowledge, rely upon inadmissible hearsay, and/or offer conclusory opinions on ultimate issues. Reply at 1, n. 2, citing PSOAF ¶¶ 4, 5, 8, 27, 31, 36, 40. NMH also objects to certain statements of additional fact on the basis of immateriality. Reply at 1, n. 2, citing PSOAF ¶¶ 14, 23–27, 31, 33–34, 40. The Court agrees with NMH that certain statements of fact about what another NMH employee told Jackson is inadmissible hearsay, and will not consider those statements in reaching its decision. PSOAF ¶ 4. The Court also agrees with NMH that unsupported speculation by Jackson is inadmissible. *Id.* ¶ 5. Further, the Court will not accept statements of fact unsupported by accurate record citation. *Id.* ¶ 8. However, the Court rejects NMH's objections to certain statements of fact as immaterial, e.g. what Brooks uncovered during his investigation, or what actions taken (or not taken) by Reagan during the investigation, as that information is relevant to NMH's investigation into the alleged misconduct, and also rejects NMH's objections to information regarding Jackson's performance, which is relevant to whether she was meeting NMH's performance expectations. *See* PSOAF ¶¶ 14, 23–26, 33–34, 40. Further, Jackson's testimony about how she felt when she was told she was terminated, and information about her

employment history with NMH, is material and relevant to Jackson bringing this lawsuit, and her performance history at NMH. *Id.* ¶¶ 27, 31.

The Court now turns to the material facts.

## III.    Material Facts

The following facts are set forth favorably to Jackson, the non-movant, as the record and Local Rule 56.1 permit. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012); *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 937 (7th Cir. 2003). While the Court draws all reasonable inferences from the facts in Jackson's favor, the Court does not "necessarily vouch[] for their accuracy." *Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 281 (7th Cir. 2015) (cleaned up); *see also Knopick v. Jayco, Inc.*, 895 F.3d 525, 527 (7th Cir. 2018) (cleaned up) ("Given this summary judgment lens, we do not vouch for the objective truth of all of these facts."). This background section details all material undisputed facts and notes where facts are disputed, to the extent the disputed facts are supported by record evidence.

Jackson, a Black or African American woman, began working for NMH in 2015. Jackson's Resp. DSOF ¶ 1. In 2016, Jackson transferred to the Emergency Department to work as a Patient Registration Representative (PRR). *Id.* ¶ 10. Jackson was hired by Reagan, who was the manager of registration over the Emergency Department. *Id.* ¶ 11. As a PRR, Jackson's job responsibilities included registering patients, collecting financial and insurance information, and requesting and collecting payments from patients for services rendered during their Emergency Department visit. *Id.* ¶ 17.

When Jackson was first hired, she digitally signed a copy of NMH's *Rules for Personal Conduct*, which stated that NMH could immediately terminate an employee for stealing property, unauthorized use of patient property, or for misusing confidential patient information. DSOF ¶ 7. Jackson also reviewed a copy of NMH's Privacy and Confidentiality: Patient, Employee, and Hospital Information (Privacy Policy), and understood that violating this policy was a terminable offense. *Id*. ¶ 8. As a PRR, Jackson had access to a wide range of personal information protected by the Privacy Policy, including names, dates of birth, social security numbers, insurance information, and credit/debit card information. Jackson's Resp. DSOF ¶ 20.

In 2017, NMH received multiple phone calls from individuals claiming that Jackson and two other PRRs—Danielle Coleman (Black/African American) and Ashia Cowin (Black/African American)—were misusing patient information, including credit card information. DSOF ¶ 23. The Hospital Operations Administrator who took the calls reported the information to Risk Management, who alerted Reagan. *Id*. ¶ 25. Over the next two days, Reagan received two phone calls from an individual who alleged that Jackson was taking pictures of patient credit cards to make purchases online. *Id*. ¶¶ 26, 27. Reagan informed multiple people about the allegations, including Williamson (Director of Patient Services), Rayan Venkatesh (Program Manager of Corporate Compliance and Integrity), and Kearston Gracia (Human Resources). *Id*. ¶ 28. Rayan Venkatesh (Venkatesh) asked Reagan to include Brooks, an investigator for NMH, on all communications. *Id*. ¶ 29.

Brooks began investigating the claims against Jackson and the other PRRs. DSOF ¶ 31. Brooks reached out to both of the individuals who had called NMH, and they provided more information about the alleged credit card theft. *Id.* ¶¶ 31–32, 36. Brooks also called the patients from whom Jackson and the other accused PRRs had allegedly collected credit card payments. *Id.* ¶ 34. Brooks learned that three individuals (a patient and two patient family members) experienced fraudulent credit card purchases after using their credit card at NMH. *Id.* ¶ 35. Coleman was the PRR who collected their credit card information. *Id.* Brooks informed CPD about the evidence of potential crimes he had collected through his investigation and a detective was assigned to the case. *Id.* ¶ 37, 41. CPD told Brooks not to interview Coleman, which Brooks related to Reagan, Williamson, and Venkatesh. *Id.* ¶ 41. Williamson and Splan (Vice President of Access) decided there was enough evidence to terminate Coleman and asked Reagan to process her termination. *Id.* ¶¶ 39, 42, 43. Coleman was terminated on August 31, 2017. *Id.* ¶ 43.

On August 31, one of the individuals who had called NMH to report Jackson emailed Brooks screenshots of text messages allegedly sent from Jackson. DSOF ¶ 49. Jackson objects to the substance of the messages as hearsay. *Id.* These text messages contained a patient's social security number, patient names, patient Medical Record Numbers, and an offer to obtain patient credit card information with the help of Cowin. *Id.* ¶ 50. Brooks forwarded the text messages to Reagan, who was confident the sender was Jackson for multiple reasons. *Id.* ¶¶ 52, 53. First, the text messages referenced the sender receiving a three on their performance evaluation, which

matched the date when Reagan had given Jackson a three on her performance evaluation. *Id.* ¶ 53. Second, the text messages referenced other PRRs by name and an employee who had recently been fired. *Id.* Third, one of the text messages from the sender indicated the sender was going on vacation next week, and Jackson was scheduled to take time off the next week. *Id.* ¶ 54. Jackson disputes that that she sent the text messages because her current phone number does not match the phone number shown in the text messages. Jackson's Resp. DSOF ¶ 50.

Reagan forwarded the text messages to Williamson and Gracia. Jackson's Resp. DSOF ¶ 52. Williamson shared the screenshots with Splan, and they decided that Jackson and Cowin should also be terminated based on the information in the text messages, and Brooks' investigation. *Id.* ¶ 55. Williamson and Splan believed the text messages were credible and that the conduct described in the text messages constituted terminable misconduct under NMH's policies. *Id.* ¶ 56. Neither Williamson nor Splan knew that Jackson was Black or African American before their decision to terminate her employment. *Id.* ¶ 78. Cowin was fired on August 31, as she was at work on that date, and Reagan planned to implement Jackson's termination the following day when Jackson was scheduled to work. *Id.* ¶ 59.

That night, Brooks received additional emails with screenshots of messages allegedly sent by Jackson. DSOF ¶ 60. This set of text messages mentioned that Cowin had been fired, and alleged that another PRR, Lidia Martinez (Hispanic), had the code to the safe, and would take bags out of the safe. *Id.* ¶ 60. Both Jackson and

Martinez were terminated the next day by phone. *Id.* ¶¶ 61, 65. Neither Coleman, Cowin, Jackson, nor Martinez were interviewed before their termination. *Id.* ¶ 64.

After terminating Jackson and the other PRRs, NMH took multiple post-termination steps, including (1) prohibiting each terminated employee from coming onto the NMH campus without a medical reason, (2) issuing "Be On the Look Out" forms to security personnel for each employee, (3) sending cease and desist letters to each terminated employee reminding them that patient information was confidential, (4) offering free credit monitoring services to the patients mentioned in the text messages, and (5) filing a breach notification with the U.S. Department of Health and Human Services. DSOF ¶¶ 66, 71–73. Brooks passed along the text messages to CPD and told them about the terminated employees. *Id.* ¶ 75.

Jackson alleges that NMH terminated her not because of the alleged misconduct, but because of her race. Resp. at 1. Jackson cites the following facts in support of her claim. First, Brooks never interviewed Jackson about the allegations against her, but recalled interviewing a "white medical assistant who was accused of diversion of controlled substances or theft of narcotics." PSOAF ¶¶ 6–7. NMH admits both facts, but objects to the facts as misleading because the medical assistant referenced by Brooks was later terminated, and because Brooks also testified that he recalls interviewing African American employees accused of misconduct when an interview was appropriate. NMH Resp. PSOAF ¶¶ 6–7. NMH asserts that Splan and Williamson decided not to interview Jackson, or the other accused employees, because they did not want to interfere with CPD's investigation. DSOF ¶¶ 57, 64.

Second, Jackson contends that Reagan does not recall whether she tried to verify the phone numbers of the two people who called to report Jackson's misconduct. NMH's Resp. PSOAF ¶ 34. Third, Jackson was not allowed to appeal her termination, and NMH banned her and the other terminated employees from the NMH campus. *Id.* ¶ 39; DSOF ¶ 66. While attempting to appeal her termination, Jackson reports seeing a Caucasian male walk in. PSOAF ¶ 4. Jackson and another terminated PRR believed that the man was there to be interviewed by Reagan for a PRR position. Resp. at 4 (citing Jackson's Decl. ¶ 10). NMH disputes this fact because after terminating the four PRRs involved, between September 1, 2017 and February 28, 2018, NMH hired five Black/African American individuals and one Hispanic (mixed race) individual for the ED Registration Department, and the four employees hired as replacements for the four terminated employees included three Black/African American individuals, and one Hispanic individual. DSOF ¶ 82. Ultimately, Jackson believes she was discriminated against based on her race because, in her words, "if I was any other color, I would be given the benefit of the doubt or I would be given [a] thorough investigation where it shows actual proof of what was done." PSOAF ¶ 5.

## Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460

(7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 256. "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Parker v. Brooks Life Sci., Inc.*, 39 F.4th 931, 936 (7th Cir. 2022) (cleaned up). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

## Analysis

The only remaining claims in this case are a Title VII and Section 1981 claim for race discrimination.[5] Specifically, Jackson alleges NMH discriminated against her based upon her race when she was terminated from NMH.

Section 1981 of the Civil Rights Act of 1866 protects the right to make and enforce contracts regardless of race. *See* 42 U.S.C. § 1981. Similarly, "Title VII prohibits an employer from 'discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021) (quoting 42 U.S.C. § 2000e-2(a)(1)). The Court applies the same analysis to Section 1981 claims as it does to Title VII claims. *See Sims v. A-Alert Exterminating Servs., Inc.*, 2014 WL 948650, at *4 (N.D. Ill. Mar. 11, 2014) (collecting cases). A plaintiff establishes a prima facie case of Title VII discrimination by establishing that she: (1) is a member of a protected class, (2) is performing her job satisfactorily, (3) suffered an adverse employment action, and (4) was treated less favorably than at least one similarly-situated [non-protected class member]." *Farrell v. Butler Univ.*, 421 F.3d 609, 613 (7th Cir. 2005).

The Seventh Circuit has done away with separating "direct" or "indirect" evidence, but rather, "the singular question for the district court is whether the plaintiff has introduced evidence that would permit a reasonable factfinder to

---

[5]The Court previously dismissed Jackson's claims for wrongful termination, breach of contract, and fraudulent misrepresentation pursuant to NMH's motion to dismiss. *Jackson v. Northwestern Memorial Hospital*, 2020 WL 6801843, at *7 (N.D. Ill. Nov. 19, 2020).

conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Igasaki*, 988 F.3d at 957 (cleaned up). If a plaintiff establishes a prima facie case of discrimination under Title VII, the Court should apply the *McDonnell Douglas* burden-shifting framework. *See id.*

"If [Jackson] establishes the prima facie case, then the burden shifts to [NMH] to offer a 'legitimate, non-discriminatory reason for the [adverse employment] decision.' And if [NMH] make[s] that showing, the burden shifts back to [Jackson] to demonstrate that the reason is pretext for race discrimination." *Bless v. Cook Cnty. Sheriff's Office*, 9 F.4th 565, 574 (7th Cir. 2021) (cleaned up); *see also Khowaja v. Sessions*, 893 F.3d 1010, 1014 (7th Cir. 2018) (clarifying that *Ortiz* did not alter the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). This is referred to as the *McDonnell Douglas* burden-shifting method of proof. *See, e.g.*, *Khowaja*, 893 F.3d at 1014.

Pretext is defined as "a dishonest explanation, a lie, rather than an oddity or an error." *Sweatt v. Union Pacific R. Co.*, 796 F.3d 701, 709 (7th Cir. 2015). To establish pretext, the plaintiff must show either that the employer was motivated by a discriminatory reason or that the proffered reason is "unworthy of credence." *Zaccagnini v. Charles Levy Circulating Co.*, 338 F.3d 672, 675–676 (7th Cir. 2003). "Pretext 'involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action.'" *Tibbs v. Administrative Office of the Illinois Courts*, 860 F.3d 502, 506 (7th Cir. 2017) (quoting

18

*Burton v. Bd. of Regents of the Univ. of Wis. Sys.*, 851 F.3d 690, 698 (7th Cir. 2017) (cleaned up). Ultimately, a court ought not "second-guess" an employer's "business decisions, even if they are wrong or bad," so long as the "employer acted in good faith and with an honest belief." *Green v. Nat'l Steep Corp., Midwest Div.*, 197 F. 3d 894, 899 (7th Cir. 1999).

### I. Jackson Has Not Established A Prima Facie Claim For Race Discrimination

Here, NMH only challenges the fourth element of Jackson's prima facie race discrimination claim: that Jackson was treated less favorably than at least one similarly-situated non-protected class member. Memo. Summ. J. at 10. Specifically, NMH argues that Jackson has not adduced any evidence that similarly situated, non-African American employees were treated more favorably, and that Jackson has not identified any NMH employee facing similar allegations of misconduct that was not terminated.[6] *Id.* In response, Jackson points to the testimony of Brooks that he recalled an investigation at NMH where he interviewed a white medical assistant who was accused of diversion of controlled substances or theft of narcotics, whereas

---

[6]NMH also seemingly challenges the second element of a prima facie claim – that Jackson was meeting NMH's legitimate expectations – but addresses this argument in the context of whether Jackson's termination was pretextual. Memo. Summ. J. at 10, n.6. The Court also addresses this argument, as styled, in the analysis on whether NMH had a legitimate reason for termination, and whether the termination was pretextual, *see* infra Section II and III. *See Duncan v. Fleetwood Motor Homes of Ind., Inc.*, 518 F. 3d 486, 491 (7th Cir. 2008)) ("Although the Seventh Circuit has cautioned that district courts need not reach the pretextual analysis without first determining whether a plaintiff can make out a prima facie case, where 'an employer has cited performance issues as the justification for its adverse action, the performance element of the prima facie case cannot be separated from the question whether the employer proffered a nonpretextual explanation for its challenged conduct.'").

Jackson was not interviewed during the investigation leading to her termination. Resp. at 6.[7]

The Court finds, based on the evidence, that Jackson has not identified any similarly situated employees outside of her protected class that were treated more favorably than she was treated. Instead, Jackson points out that she, along with three other minorities, were all terminated for their alleged involvement in misusing patient information, and those three other PRRs were either Black or African American, or Hispanic. To the extent Jackson argues the terminations were in order for NMH to interview and hire non-Black or African American employees, this is unsupported by any evidence, and expressly refuted by NMH. Specifically, NMH asserts that the replacements hired for the terminated employees were all Black or African American, or Hispanic, or the same races as the terminated employees. DSOF ¶ 82. Further, to the extent Jackson argues non-Black or African American employees were treated more favorably in other employee investigations, this is also unsupported by any evidence. Although Jackson highlights the testimony of investigator Brooks as identifying an investigation where he interviewed a white medical assistant as part of an investigation, as NMH points out, there is no record evidence from Jackson on whether that NMH employee was similarly situated. Reply at 3–6. Although Jackson also includes a white nurse in her argument, as NMH also points out, that assertion is not supported by Brooks' testimony cited-to by Jackson,

---

[7]Jackson makes other allegations regarding the alleged similarly situated employee(s), however she does not support the allegations with record citation, and for that reason the Court will not consider the unsupported statements. *See* Resp. at 7.

either. *Id.* at 4. In any event, NMH asserts that the employee referenced by Brooks was later terminated, and that Brooks testified that he recalls interviewing African American employees accused of misconduct when an interview was appropriate. NMH Resp. PSOAF ¶¶ 6–7. Further, Jackson's self-serving testimony that she believed she would have been "given the benefit of the doubt" or a more "thorough investigation" if she were non-Black or African American is not sufficient to create an issue of material fact on summary judgment. *See* PSOAF ¶ 5; Resp. at 7; *Karazanos v. Navistar Intern. Transp. Corp.*, 948 F.2d 332, 337 (7th Cir. 1991) ("a plaintiff's speculation is not a sufficient defense to a summary judgment motion.")

In short, the Court agrees with NMH that Jackson has not adduced any evidence on whether any purported similarly situated employees were, in fact, similarly situated, for example, who supervised them, whether law enforcement was involved in the investigation, who the decisionmakers were, whether they were terminated or not, etc. The information Jackson has identified for the one alleged similarly situated employee identified by Jackson suggests that employee was in a different position (medical assistant), and investigated for different misconduct (diversion of controlled substances, or theft of narcotics). Resp. at 7. For the employees that were also involved in NMH's investigation for similar misconduct as Jackson was investigated for, the record supports those employees—including an employee outside of Jackson protected class—were treated the same by NMH. Although Jackson argues that whether the medical assistant was a comparator is a question of fact for the jury, here the Court has no information from which it can

21

conclude this employee identified by Jackson was a comparator under the law. This is illustrated by the case law cited to by Jackson herself. *See Humphries v. CBOCS West, Inc.*, 474 F. 3d 387, 405 (7th Cir. 2007) (to evaluate whether employees are similarly situated the Court must find that there are "sufficient commonalities on key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination."); *Coleman v. Donahoe*, 667 F.3d 835, 841, 2012 WL 32062, at *1 (C.A.7 (Ill.), 2012) (finding sufficient evidence in the record for a determination that two co-workers were comparators where "two white, male co-workers were disciplined by the same decisionmaker, subject to the same code of conduct, and disciplined more leniently for violating the same rule as [employee].") Conversely, here, the Court does not have similar record evidence to make that finding, and contrary to Jackson's assertions, there is no record evidence of selective enforcement of NMH rules.

Thus, Jackson is unable to identify any record evidence that similarly situated employees were treated more favorably, and she has failed to establish a prima facie case of race discrimination.

## II.    NMH Had A Legitimate, Non-discriminatory Reason for Terminating Jackson

Even if Jackson established a prima facie case of race discrimination, which she has not, under the *McDonnell-Douglas* burden shifting analysis, the Court looks to whether NMH had a legitimate, non-discriminatory reason for the termination. If

NMH meets that burden, then it is Jackson's burden to establish the reason for termination is pretextual. *See Bless*, 9 F.4th at 574.

Here, NMH believed that Jackson "violated the Rules for Personal Conduct relating to the mishandling/stealing/unauthorized personal use of NM/others' property." Memo. Summ. J. at 10. NMH received communications from a confidential informant that Jackson had stolen and misused (or attempted to misuse) patient information. *Id.* NMH, in its investigation, verified the text messages allegedly sent by Jackson to the confidential informant based on recent events in the workplace, including Jackson's recent performance review, which was referenced in the conversation, references to other PRRs "Asia" (sic) and "Lydia" (sic), and references to a scheduled vacation by Jackson the following week. Based on the text messages, and that CPD indicated to NMH it would be investigating Coleman, along with Jackson and Cowin, and CPD's direction not to interview Coleman, the decision was made by NMH not to interview Jackson. *See* DSOF ¶ 57. NMH decisionmakers, Splan and Williamson, decided to terminate Jackson's employment without interviewing her. *Id.* ¶¶ 55–56. NMH argues its belief that Jackson had engaged in the misconduct is a legitimate, non-discriminatory reason for her termination. Memo. Summ. J. at 11 (citing *Han v. Whole Foods Mkt. Grp., Inc.*, 44 F. Supp. 3d 769, 794 (N.D. Ill. 2014)). In *Han*, an employee was terminated based on the employer's belief that she had stolen food. *Id.* The employee disputed that she stole the food, explaining that she had paid for the food. *Id.* at 784. Nevertheless, the court found that the employer's determination that the employee had stolen the food was a legitimate, non-

discriminatory reason for her termination. *Id.* at 794. So too here, the Court agrees that the record supports that NMH had a legitimate reason for terminating Jackson's employment, namely NMH's belief that Jackson had engaged in misconduct involving sensitive patient information.

The Court next considers whether Jackson has established that the reason for her termination was pretextual.

### III.    Jackson Has Not Demonstrated That NMH Acted With Pretext

Jackson fails to demonstrate that NMH's explanation for Jackson's termination is pretextual. Splan and Williamson—the decisionmakers responsible for ordering Jackson's termination—did not know her race, nor the race of the other terminated employees, at the time of termination. DSOF ¶ 78; *see, e.g.*, *Martinez v. Northwestern Memorial Healthcare*, 2021 WL 4635798, at *4 (N.D. Ill. Oct. 7, 2021) (crediting that Splan and Williamson did not know Martinez—or the other terminated employees races—at the time of termination, and finding no evidence of pretext). Further, Jackson does not identify any race-related comments or stray remarks made by anyone involved in the termination decision, or throughout its investigation. *See id.* While Jackson posits that NMH fired her so she could be replaced by a non-Black or African American person, the PRRs hired in the six months after her termination were either Black or African American, or Hispanic. DSOF ¶ 82.

Although Jackson argues NMH's reason for Jackson's termination was "illegitimate, dishonest, unworthy of credence, have weaknesses, inconsistencies, are

contradictory, based on discriminatory intent, and lack good faith[,]" Jackson does not point to anything in the factual record to support these conclusions. Resp. at 9. Instead, Jackson repeatedly relies upon her assertion that NMH did not have concrete proof she engaged in the misconduct which led to her termination. *Id.* at 9–10. However, this does not transform NMH's reason for termination into a pretext. Jackson also alleges she was treated disparately by being prohibited from appealing her termination. *Id.* at 11. Again, NMH has offered evidence that this applied to each of the employees involved in this investigation, citing NMH's Appeal Policy which does not provide a contractual right to appeal, and the fact that NMH did not allow appeal given the reasons for termination, involvement of CPD, and the safety concerns of having the terminated employees on NMH's property. Reply at 14–15.

Jackson points to the generalized statements of one of the terminated employees, Cowin, regarding her perception that the dress code was enforced differently depending on the race of the employee, without specifying any details on this broad allegation, such as pertinent information about time, place, speaker, etc. PSOAF ¶ 8. In any event, again, this does nothing in terms of a pretextual analysis, and is not evidence for the Court to consider in any of its analysis with respect to Jackson's termination. Jackson also criticizes the lack of CPD records showing any investigation, and argues that the actions taken by NMH after the terminations – e.g. sending a cease and desist regarding the misuse of patient information, sending letters to the patients whose names had been identified in the breach, reporting to the Office for Civil Rights at the U.S. Department of Health and Human Services,

25

"proves nothing." *Id.* at 12. The Court disagrees, as the actions taken by NMH—which demonstrate a reasonable belief in the reasons for her termination—undermine Jackson's argument that her termination was pretextual. The burden is on Jackson to establish pretext, and she has failed to do so. Jackson has not identified a dishonest explanation, or a lie told by NMH in investigating or processing Jackson's termination. *See Sweatt*, 796 F.3d at 709.

To the extent Jackson contends NMH employees, and non-decisionmakers, did not remember certain details during their depositions, the Court finds that a lack of recollection is not itself evidence of pretext. Resp. at 9–10. The inquiry goes to whether the *decisionmakers* honestly believed the reason for termination. *Stockwell v. City of Harvey*, 597 F.3d 895, 902 (7th Cir. 2010) (cleaned up) ("pretext does not exist if the decisionmaker honestly believed the nondiscriminatory reason. This is because courts are not 'superpersonnel departments' charged with determining best business practices."); *see* Reply at 7. Further, Jackson's argument that Reagan, a non-decisionmaker, "could not give legitimate reasons for Jackson's termination" during an unemployment hearing is not supported by any citation to admissible evidence. *See* Resp. at 11 (citing Jackson's deposition testimony and her summary of other's statements from the IDES hearing, which is inadmissible hearsay). Relatedly, Jackson's argument that the testimony of Venkatesh, a non-decisionmaker, that he could not conclusively state that stealing did in fact occur, as demonstrative of pretext, is also misplaced. Resp. at 9–10. His testimony does not operate to change

the decisionmakers' belief at the time of termination that the misconduct involving Jackson did occur. *See Stockwell*, 597 F.3d at 902.

Jackson also calls the investigation a "sham investigation" *Id.* at 12 (citing *Lampley v. Onyx Acceptance Corp.*, 340 F. 3d 478, 483 (7th Cir. 2003)). Yet *Lampley* is readily distinguishable. In *Lampley*, the employer presented information to the U.S. Equal Employment Opportunity Commission to establish the employee was a poor performer, which led to his termination. 340 F.3d at 483. The employee, however, presented statistics showing he was meeting, and at time greatly exceeding, the employer's expectations. *Id.* Thus, the district court determined that "the jury could have reasonably believed that the numbers [the employer provided] . . . were doctored solely to discredit [the employee]." *Id.* The Seventh Circuit affirmed the district court's decision to allow punitive damages to go before the jury "[b]ecause a jury could have found that [the employer] engaged in a cover-up rather than a good faith investigation of [the employee's] retaliatory discharge claim[.]" *Id.* Thus, the standard was not evaluating the sufficiency of the evidence on summary judgment. Conversely, in this case, the performance reviews of Jackson are not in dispute; rather, a policy violation was identified as the reason for termination. There is no credible evidence that NMH "doctored" any information it relied upon in reaching the result of its investigation, and that Jackson disagrees with how the investigation was handled, or how it concluded, does not somehow transform it into a "sham" investigation.

To the extent Jackson disputes the evidence NMH relied upon in reaching its decision to terminate her employment as evidence of pretext, *i.e.* "the only things [NMH] have that slightly resemble evidence are unauthenticated text messages, e-mails, and allegations of phone calls between 'confidential informants' 'CPD' and the 'FBI,'" the Court notes that Jackson seemingly argues that in its workplace investigation NMH is held to the same evidentiary standards as the Court is held to on summary judgment. *See* Resp. at 1. However, Jackson has failed to identify case law to support her contention regarding the evidentiary standards she believes NMH was required to follow in its workplace investigation. Further, these challenges to the evidence relied upon by NMH in reaching its decision to terminate Jackson's employment do not support any finding of pretext. Ultimately, the inquiry of the Court is not the correctness of NMH's decision. Rather, it is whether NMH acted in good faith, and with an honest belief. *See Green*, 197 F. 3d at 899. Jackson's disagreement with the decision to terminate her employment does not make that decision by NMH a pretext. *Tibbs*, 860 F.3d at 506 ("Merely disagreeing with an employer's reasons does not meet this standard.")

All in all, Jackson has not adduced evidence to undermine whether NMH reasonably believed that Jackson engaged in the misconduct, which was the basis of its decision to terminate her employment.

### IV. Jackson Cannot Prove Her Claim Under Any Other Method

Jackson also argues she can succeed under the "direct method" analysis of a claim of race discrimination. However, the Seventh Circuit had instructed district

courts not to distinguish between indirect and direct frameworks anymore. *See Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) ("Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence. Evidence is evidence.")

In any event, the Court disagrees with Jackson's contention that she can succeed by evaluating "direct" evidence. Considering the evidence as a whole, as the Court must do, the Court finds there is insufficient evidence to support the finding that NMH acted on account of Jackson's race when it decided to terminate her. The "circumstantial evidence" identified by Jackson – namely that Jackson was terminated along with three other minorities (although she contends NMH only had proof one of those employees actually used patient cards); that NMH banned the terminated employees from the campus unless they needed medical treatment; that Jackson and Martinez saw a Caucasian man they thought was interviewing for a PRR position after their termination; that she received a "meets expectations" score on her performance review; and her feelings about how she was treated on third shift – do not change the undisputed facts that NMH (1) received a complaint implicating Jackson in misusing patient information, a clear violation of NMH policy, (2) received information corroborating that accusation, and (3) worked in connection with CPD and decided not to interview Jackson or the other employees before terminating them based on information from CPD. Thus, the Court disagrees that Jackson has adduced

evidence to suggest her race was the reason for her termination, and she fails under a direct analysis as well.

Jackson has failed to create any genuine dispute of material fact, and, accordingly, NMH is entitled to summary judgment.

## Conclusion

For the foregoing reasons, NMH's motion for summary judgment [61] is granted. Civil case terminated.

Date: September 12, 2023

United States District Judge
Franklin U. Valderrama